IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| LESLIE RAY HANSEN, ) | |
| ) | Case No. 06-6173-HO |
| Plaintiff, ) | |
| ) | |
| v. ) | ORDER |
| ) | |
| UNUM PROVIDENT CORPORATION, ) | |
| a Delaware corporation, aka ) | |
| Unum Life Insurance Company of ) | |
| America; THE JP MORGAN CHASE ) | |
| DISABILITY LEAVE POLICY AND ) | |
| LONG-TERM DISABILITY PLAN; and ) | |
| CHASE MANHATTAN MORTGAGE ) | |
| CORPORATION, a New Jersey ) | |
| corporation, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

Plaintiff brings this action pursuant to the Employee Retirement Income Security Act (ERISA). Plaintiff seeks recovery of benefits under an ERISA plan, enforcement of his rights under the plan, and clarification of his rights to future benefits under the plan.

BACKGROUND

Plaintiff worked as an account executive/loan officer for JP Morgan Chase Bank from August 12, 2001, until May 31, 2004. Prior to starting work for JP Morgan Chase, plaintiff underwent surgery for aortic valve disease in April of 2000 and had been released for work with some lifting, bending, and climbing restrictions, but no administrative duties restrictions, effective July 1, 2000. Administrative Record at p. 267.

In May of 2001, plaintiff's echocardiogram showed a left ventricular ejection fraction of 35% and plaintiff's cardiologist, Dr. Dreiling, noted congestive heart failure and prescribed coreg. Plaintiff also reported weakness in his left hand which was attributed to a stroke occurring during his heart operation. See, e.g., Administrative Record at p. 256.

On May 19, 2005, plaintiff reported to his attorney that in the time that he worked for JP Morgan, he only averaged 2 loans per month and that

> during 2001 to 2004, [I] had 12 processors and three managers and a period of time with no manager. This made nearly every loan stressful, destroyed my clientele, ruined my realtor relationships, and I had to fight for many of the commissions earned. Some took up to 8 months to be paid for and my "manager" did little or nothing to help solve the problems. I sent many memos and e-mails to Gary Duffy to ask for help when I was at wits end and got NO response. It appeared that he opened the Salem office to accommodate the Prudential Real Estate office and when that relationship was severed he lost interest in Salem and it's employees.

Administrative Record at pp. 300-01. In the same letter, plaintiff did note certain stresses in the office and stated "A number of

loan officers came and went; I hung in there as I really couldn't change that easily because of my age and certainly because of my medical history. At this time, I was put on Coreg and had to deal with fatigue as well as the stress." Administrative Record at p. 299. Plaintiff also noted that in that year, 2002, he drafted a letter to the manager stating the problems he was having with the medicines and that the response was for him to file for short-term disability, but that he continued to work. Id. See also, Administrative Record at p. 303 (plaintiff explains to manager his problems with medication causing stamina and energy problems).

On February 18, 2004, Dr. Richard Alley, plaintiff's treating physician, noted that plaintiff has

> recurrent chest pain with some anxiety over conflict between he and his parent company regarding work issues.... I just wanted to document the fact that he suffers with documented heart disease, which is now complicated by almost daily stress, worsening his heart condition ... he has objective evidence of heart disease worsening based on acute and chronic stress.

Administrative Record at p. 274.

In June of 2004, plaintiff filed a short-term disability claim citing stress, fatigue and heart related problems. Administrative Record at p. 29. Plaintiff noted that his condition was possibly related to his employment. Id. Plaintiff also attached a statement from Dr. Alley in which he notes plaintiff suffers generalized weakness of all muscle groups and exhibits symptoms of fatigue and depression, and restricted him from work for "10-12 weeks ?". Administrative Record at p. 30.

Chase's disability leave policy (DLP) provides for short-term disability (STD) benefits. STD benefits are available under the DLP only if an employee suffers a disability which is defined as follows:

> A period of illness or injury during which you're unable to perform all the material and substantial duties of your occupation on an active employment basis. You must be under the care of a licensed physician during this time and certified as disabled by UnumProvident for non-occupational illnesses or injuries . . . .

Ex. A (attached to Declaration of Bruce Dominick (#31)) at p. 5. In addition, STD benefits are payable only after the employee has been disabled for seven calendar days. Id. at p. 9.

The DLP also provides that it "does not cover any disability that results from: an occupational injury or illness . . ." Id. at p. 10. An "occupational injury or illness" is defined as "an injury or illness that was sustained in the course of or arose out of work." Id. The DLP also provides that "[b]enefits under the Disability Leave Policy cannot continue for more than 25 weeks. However, if you're still disabled after this period, you may then be eligible for benefits under the Long-Term Disability Plan . . ." Id. at p. 9.

On August 16, 2004, Unum advised plaintiff that his claim for STD benefits had been approved through August 2, 2004. Administrative Record at 48-49. Unum determined that plaintiff's disability began on May 31, 2004, and, accordingly, his benefits began seven days later, on June 7, 2004. Unum thus paid plaintiff eight weeks of STD benefits.

At the time of the decision, Unum only had Dr. Alley's brief statement contained in the application. Unum requested additional information for benefits to continue past August 2, 2004. Administrative Record at p. 49. On August 30, 2004, Unum notified plaintiff that it had not received any further medical information. Administrative Record at p. 53. On September 7, 2004, plaintiff indicated to Unum that he had faxed a request to his physician's office to comply as soon as possible. Id. at p. 55. Plaintiff also noted:

> This claim was brought on by stress of my specific office being unable to process loans in a normal time frame due to employee turnover. Every loan was a nightmare. (I had 3 managers and 12 processors in a 2½ [year] period). The stress and resulting "burn-out" has complicated my existing heart problems (Congestive Heart Failure) creating the ongoing fatigue; only time will tell if this will clear up or if I'm looking at long-term disability.

Id.

Having not received additional medical information, Unum closed plaintiff's claim on September 16, 2004, but noted that it would reopen the claim if it received the requested information within 30 days. Id. at 59. On September 28, 2004, Dr. Alley provided Unum with a chart note for plaintiff dated August 2, 2004, in which he notes recovery from coronary artery disease, but that plaintiff still has troubles with activities of daily living and basic work performance. Id. at 65. On October 4, 2005, Dr. Alley provided a letter to Unum in which he notes fatigue related to heart disease. Dr. Alley also noted white matter disease and small infarcts of the brain and that a neurological evaluation would be

set.  Id. at 85.

Unum called plaintiff on October 4, 2005, to obtain further information, id. at 71, and on that day extended his benefits to October 4, 2004.  Id. at 80.  Unum again requested further information if benefits were to continue.  Unum requested all current medical records and a functional abilities assessment. Unum also request information directly from Dr. Alley. Administrative Record at p. 77.

On October 27, 2004, Dr. Alley completed a functional assessment in which he opined that plaintiff could, in an eight-hour workday, perform six hours of sedentary activity,[1] and two hours of light activity.[2]  Id. at p. 103.  Dr. alley also opined that plaintiff qualifies for long-term disability and continues with post-traumatic stress disorder (PTSD) relative to work issues. Id. at p. 106.

Unum sought a review of the file by Mark Nichols, a registered nurse, in November of 2004.  Nichols opined that there was insufficient medical data to support Dr. Alley's conclusion and noted a need for additional medical data to be submitted.  Id. at p. 114.  Nichols noted no mental status exam, no medications prescribed for PTSD, and no indication of referral to a mental health provider.  Nichols also noted a lack of a record for stress

---

[1] Sedentary activity is defined as 10 pounds maximum lifting or carrying, walking/standing on occasion, and sitting 6/8 hours.

[2] Light activity is defined as 20 pounds maximum lifting, carrying 10 pounds frequently, most jobs involving standing with a degree of pushing and pulling, and standing 6/8 hours.

tests, cardiac imaging, or any indication of a referral to a cardiologist. Accordingly, Unum requested additional information and referral information from Dr. Alley on November 30, 2004. Dr. Alley responded that plaintiff had not been referred to a cardiologist or counselor because that was not clinically indicated. Id. at p. 132.

Dr. Donna Carr reviewed the medical record on December 28, 2004, and opined that given reported combined medical conditions in combination with stress and anxiety, it would be medically reasonable to expect both cardiac and psychiatric referrals. Administrative Record at p. 151. Dr. Carr also noted the absence of objective medical data.

On December 22, 2004, plaintiff wrote that he was "on a stress-related leave." Id. at p. 143. On January 10, 2005, plaintiff wrote

> [My Physician] has also stated that my occupation adds to the physical problems due to the stress in my job. In the 3+ years that I have been with Chase, I have had three managers, 12 different processors, and numerous angry clients due to the disrupted service. My job is to be the person on the front lines with the clients, so all of the stress falls on me to clear the problems. This level of intensity has taken it's toll on my physical well being.
> . . .

Id. at p. 164.

On January 9, 2005, Dianna Martin, R.N., a nurse with Unum contacted Dr. Alley's office to obtain more information and learned that Dr. Alley still had not referred plaintiff to a cardiologist or for a mental status exam and that plaintiff last saw a

cardiologist, Dr. Dreiling, in 2002. Administrative Record at p. 173. Martin concluded, based on the information she had, deconditioning and age are likely factors that have changed plaintiff's perceived self status of function, but that there is no medical or clinical change and no further clinical assessments to evaluate. She opined that plaintiff is at least capable of functioning at a sedentary level. Id. at 161.

On February 2, 2005, Unum informed plaintiff that it concluded that benefits would not be paid beyond October 4, 2004. Id. at 187-190. Unum noted the lack of medical documentation provided including no diagnostic findings or physical exams, no medical support from a neurologist, and no psychological evaluation.

Plaintiff appealed the decision and submitted additional medical records on July 8, 2005. Id. at p. 232-33, 234-39. The appeal included an April 27, 2005 report from Dr. Alley asserting a long history of cardiac issues, and depression and anxiety related to his job. Dr. Alley also noted side-effects from medications. Id. at p. 234. Plaintiff also submitted a psychological evaluation from Dr. John Nance, Ph.D. in which Dr. Nance noted that "on the psychological side most of the stress is job related." Id. at p. 238.

Unum requested review of the file by Dr. Costas Lambrew, a cardiologist, and Dr. Jana Zimmerman, a clinical neuropsychologist. See Administrative Record at pp. 346-47, 358, 418-22. Dr. Lambrew found a lack of medical evidence to support an objective evaluation

of limitation related to cardiac disease or neurological/psychological problems. Accordingly, Unum requested that plaintiff provide all office notes, consultation reports, tests results, or other medical records from any treatment providers. Id. at p. 364.

Plaintiff responded with more records from Dr. Alley and Dr. Nance, including a chart note from Dr. Alley dated January 26, 2005, noting job related stress disorder. Id. at p. 398. Dr. Lambrew reviewed the materials and found:

> Dr. Alley's records do not clarify the reason for Mr. Hanson's leaving work four years after his cardiac surgery, 5/31/04. A note I can read on 6/28/04 records "fatigue" Not able to demonstrate cardiac failure yet." . . . On 12/8/04, Dr. Alley notes "progressive weakness and inability to exercise" and attributes this to deconditioning. He mentioned mild left handed weakness, but no exam documents this, and this did not limit him from working prior to 5/31/04. The only possible support for mild failure in ? 7/20/05 when Dr. Alley hears a few rales which clear on cough, finds no venous distention and gives him a diuretic. On 8/1/05, he returns with a 12-pound weight loss, feels better. Dr. Alley records an elevated BNP, which is a reflection of failure. No other exam documents any signs of failure, or symptoms that cannot be attributed to obesity, deconditioning. There is consistent mention of marked obesity, deconditioning, but no evidence for cardiac dysfunction by symptoms, study or clinical exam that would cause functional impairment at a level that caused him to stop working four years after his cardiac surgery. There is consistent comment by Dr. Alley of job-related stress disorder as the reason for the visit, and he is referred to Dr. Nance for evaluation ½6/05.

Administrative Record at p. 416.

Dr. Zimmerman also concluded there was insufficient evidence that plaintiff had a disabling psychiatric condition. She noted a lack of treatment sought by plaintiff around the alleged date of

disability and that the information in the record regarding psychiatric conditions revealed job-related stress. Id at pp. 419-22. Dr. Zimmerman and Dr. Lambrew reviewed the claim from a comorbid perspective and agreed that the claim was based on a work-related condition rather than a combination of impairments from a psychiatric and medical condition. Id. at 424.

On November 21, 2005, Unum informed plaintiff that its decision to deny benefits was upheld. Unum denied benefits because the medical record did not show plaintiff was disabled and because the reported stress was work related and excluded from coverage. Unum noted the cardiac history including the surgery in 2000, but found no records to describe changes in functioning on May 31, 2004. Id. at 437-40.

Plaintiff filed a second appeal which included a report from Dr. Perry Nelson and Unum requested more information from Dr. Perry. Dr. Perry provided chart notes from September 2005 on. Dr. Perry noted a recent aortic valve replacement and that plaintiff was doing much better. Id. at 569. Dr. Lambrew reviewed the medical records and concluded:

> The medical records submitted do not document any evidence of heart failure or heart failure related symptoms from 6/04 through 12/04. Dr. Alley continued to ascribe his complaint of fatigue, and anxiety, irritability to job related stress. It is likely that heart failure, which occurred in July of 2005, was precipitated by the development of endocarditis, with significant and persistent clinical deterioration afterwards, with persistent evidence of heart failure which would impose limitations and restrictions after 7/20/05 that would preclude sustained work capacity.

> Conclusions: With a reasonable degree of medical certainty, I would conclude that the medical evidence would support an opinion that as of 10/4/04, claimant had no evident physical or mental impairment, as evaluated by Dr. Zimmerman, that would have precluded his return to sustained work or R&Ls related to these diagnoses and his medical comorbidities, through 7/20/05, when his heart failed because of endocarditis.

Administrative Record at pp/ 584-85.

Unum again denied the claim on June 8, 2006, and addressed plaintiff's assertion that Unum had arbitrarily terminated benefits after having determined that plaintiff was disabled without any evidence of improvement:

> According to the file, benefits were paid to Mr. Hansen based on his reported symptoms as well as the Attending Physician's Statement provided by Dr. Alley. Upon review of complete medical documentation, it has been determined on appeal that Mr. Hansen did not meet the definition of disability as defined above beginning with his last day of work.

Id. at p. 592. Unum continued in its assertion of job-related stress and lack of evidence of disability at any rate. Id. at p. 593.

## DISCUSSION

A.  Standard of Review

The parties agree that this court's review of the decision to deny benefits with respect to STD coverage is de novo because the DLP does not confer discretionary authority to construe the terms of the plan. See Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 964-65 (9th Cir. 2006). Under this standard, the court simply proceeds to evaluate whether the plan administrator correctly or

incorrectly denied benefits.  See, id. at 963.

B.   Exclusion for Disabilities Resulting From Occupational Illness or Injury

Defendants contend that plaintiff's claim is barred under the DLP's exclusion for occupational illnesses or injuries.  As noted above, the DLP does not cover any disability that results from an occupational injury or illness.  An occupational injury or illness is defined as "an injury or illness that was sustained in the course of or arose out of work."  The parties acknowledge that the burden of proving that the exclusion exists rests on defendants. See Mario v. P & C Food Markets, Inc., 313 F.3d 758, 765 (2d Cir. 2002) (the insured has the burden of proving that a benefit is covered, while the insurer has the burden of proving that an exclusion applies).

Plaintiff contends that his disability is a direct result of his heart disease and the medications prescribed for it, not his work.  Plaintiff concedes that his own comments often described the stress of his job, but he argues that these comments demonstrate his heart disease and medications are what made it impossible for him to work under those stressful conditions.  Plaintiff also contends that Dr. Alley's statements demonstrate that it is his heart condition that is the primary factor in his disability.  See, e.g., Administrative Record at p. 85 ("disability based on ... extensive heart disease"); at p. 277 ("ongoing fatigue ... related

to beta blocker).

However, plaintiff himself notes that his heart never approached a normal level of functioning after his surgery prior to his employment with Chase and that he was never able to work under the stress caused by his job. Plaintiff worked for Chase for almost four years after his heart surgery. In a letter to Unum regarding his application for benefits plaintiff stated "this claim was brought on by the stress of my specific office being unable to process loans in a normal time frame due to employee turnover." Administrative Record at p. 55; See also, p. 164 (level of intensity of the job has taken its toll on my physical well-being). Indeed, plaintiff spoke to lawyers regarding filing a worker's compensation claim regarding the stress suffered as a result of his job. See Administrative Record at p. 378:

> [Plaintiff] sought the aid of a second specialist and inquired about a Worker's Compensation claim. Mr. Hansen informed me that the attorney he conferred with suggested that such a claim would be tied up in court for years and would present no immediate solution to the problems he was then having, i.e., not receiving his commissions on time, not getting the support from Chase that was necessary for him to perform his job, etc.
>
> .... As to the Worker's Comp issue, I will be referring him to another attorney to further explore that potential aspect of his claim. However, even when those avenues are pursued, UNUM's responsibility to Mr. Hansen is to provide him with coverage he has paid for to cover him in the event he is unable to work.

The DLP expressly recognizes that if an employee has an "occupational illness or injury", the employee may be eligible for worker's compensation benefits. Ex A to Declaration of Bruce

Dominick (#31) at p. 5.

On October 27, 2004, Dr. Alley opined that plaintiff "continues with PTSD relative to work issues." Administrative Record at p. 106. On January 26, 2005, Dr. Alley's chart notes reflect that plaintiff was seen for "job-related stress disorder." <u>Id</u>. at p. 571. The psychologist who evaluated plaintiff also noted that "[o]n the psychological side most of his stress is job-related." <u>Id</u>. at p. 238. Plaintiff's counsel in a letter to Unum dated July 8, 2005, wrote:

> I am submitting for your review medical information and chart notes documenting the severity of Mr. Hansen's condition and the history of increasing stress related issues <u>directly attributable to his employment with Chase</u>. For months he was not paid his commission. His phone calls to management were not returned. Loans were not closed on time. Clients lost favorable interest rates. Relationships with real estate professionals and repeat customers were destroyed because of unreasonable delays and failures to close loans in a timely manner. Lack of support from Chase ruined his reputation in the real estate community, ruined the goodwill he created with those he worked regularly with for over 20 years, ruined his repeat business.

Administrative Record at p. 233 (emphasis added).

Plaintiff, plaintiff's counsel, and plaintiff's treating physician all described his illness as a stress disorder sustained in the course of or arising out of his work. Even in his initial application plaintiff acknowledged that his illness was "possibly" related to his employment. Defendants have demonstrated that plaintiff's claim is barred under the occupational illness exclusion. Moreover, the court agrees that based on the record provided to Unum in support of plaintiffs claim, Unum correctly

determined that plaintiff was not disabled as of October 4, 2004, for the reasons stated in the briefing submitted by defendant in this case.

## CONCLUSION

For the reasons stated above, Unum Provident's decision to discontinue benefits under the disability leave policy for short-term disability benefits was correct and this action is dismissed.

DATED this  6th   day of March, 2008.

                           s/ Michael R. Hogan
                           UNITED STATES DISTRICT JUDGE